# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| MITCHELL GOFF, | ) |
| Plaintiff, | ) |
| v. | ) CIVIL ACTION 18-0529-WS-MU |
| PERFORMANCE CONTRACTORS, INC., | ) |
| Defendant. | ) |

## ORDER

This matter comes before the Court on defendant's Motion for Summary Judgment (doc. 25). The Motion has been fully briefed and is now ripe. Also pending is defendant's Motion to Strike (doc. 31) portions of plaintiff's declaration and opposition brief.[1]

**I.    Nature of the Case.**

Plaintiff, Mitchell Goff, applied for a position with defendant, Performance Contractors, Inc. Although defendant initially extended an offer of employment to plaintiff, it rescinded that offer after being notified of plaintiff's work restrictions recommended by third-party medical providers retained by defendant to conduct pre-employment screenings. In the wake of that rescission decision, plaintiff filed a Complaint (doc. 1) in this District Court bringing an array of claims against defendant pursuant to the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"). In particular, plaintiff asserts ADA claims on theories of failure to provide reasonable accommodation, discrimination based on perceived disability, retaliation for protected activity, and failure to hire. Defendant now moves for summary judgment on all

---

[1]    Several weeks after briefing on the Motion for Summary Judgment concluded, plaintiff filed a Motion to Supplement (doc. 32) wherein he requested leave to supplement his summary judgment filings with a revised opposition brief that includes supporting Page ID pinpoint citations to the record and adds a missing one-page exhibit. In its discretion, the Court **grants** the Motion to Supplement and has considered the exhibits appended to such Motion in fashioning this Order.

claims. Plaintiff opposes the Motion, although he concedes that it is due to be granted as to the ADA retaliation cause of action.[2]

## II.     Factual Background.

Most of the relevant facts are not in dispute; however, the parties strenuously disagree about the legal implications of those facts.[3]

### *A.     Plaintiff's Health Conditions and Work Experience.*

Plaintiff, Mitchell Goff, suffered a work-related injury in 1998 that required him to undergo back surgery to repair a bulging disc. (Doc. 28-2, at 9, PageID.259.) As a result of that medical procedure, a bone fragment became embedded in and ultimately cut a nerve, causing Goff to have drop foot in his left leg, such that his foot hangs down. (*Id.* at 8-10.) This condition affects Goff by requiring him "to pick up my foot higher than what you normally

---

[2]     *See* doc. 29, at 26, PageID.350 ("Plaintiff asks this honorable Court to deny the Defendant's Motion for Summary Judgment and allow a jury to resolve the factual disputes between the parties on all claims except the Retaliation claim."). This concession is appropriate. After all, the Complaint identifies as "protected activity" plaintiff's purported request for an accommodation and his statement that he would seek legal representation if the company's doctor did not return his call. (Doc. 1, ¶¶ 58-59.) Both events are alleged to have occurred only <u>after</u> defendant had rescinded Goff's job offer; therefore, the challenged personnel action could not have been taken in retaliation for this purported protected activity. *See generally Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016) (to prevail on ADA retaliation claim, plaintiff must show but-for causation between statutorily protected expression and adverse employment action). On this record, and given plaintiff's acknowledgment, the Motion for Summary Judgment is properly **granted** as to the ADA retaliation claim.

[3]     The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Smith v. LePage*, 834 F.3d 1285, 1296 (11th Cir. 2016) ("It is not this Court's function to weigh the facts and decide the truth of the matter at summary judgment …. Instead, where there are varying accounts of what happened, the proper standard requires us to adopt the account most favorable to the non-movants.") (citations and internal quotation marks omitted). Accordingly, the record will be viewed in the light most favorable to plaintiff, with all justifiable inferences drawn in his favor. Also, federal courts cannot weigh credibility at the summary judgment stage. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices."). Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but instead accept[s] Plaintiff's version of the facts drawing all justifiable inferences in [his] favor." *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008).

would to walk. I had to teach myself how to walk." (*Id.* at 10-11, PageID.260.) According to Goff, it was initially a challenge to learn to walk again, but "now it's not as much." (*Id.*)

Goff was released to return to construction work in 2000, and has worked in that field continuously since that time. (*Id.* at 16, PageID.261.) In connection with that endeavor, Goff works at heights, lifts heavy objects, and has been assigned to multi-year projects. (*Id.*) When asked directly how his medical condition affects his daily living, if at all, Goff responded, "It – I mean it really – it doesn't. I mean I hunt, I fish, play with my grand kids, you know." (*Id.* at 12-13, PageID.260.) That said, Goff does take prescription medication for pain management, including 10 milligrams of Norco three times daily. Norco is a narcotic which he has been taking "[o]ff and on for the last twenty years." (*Id.*) The Norco is prescribed for Goff to take every six hours as needed; however, he adjusts his schedule to take the medication when he is off work so that it will clear his system before he reports to work. (*Id.* at 14-15; PageID.261.) According to Goff, his drop foot is related to his back problems and he still suffers from back pain. (*Id.* at 100; PageID.271.) When asked by his lawyer how the "complications from the back problem" affect him today, Goff testified, "Not a whole lot. I mean – I usually just push myself to get through with everything." (*Id.* at 101.) In response to a follow-up question, "are you saying that it does not stop you from going forward and working?" Goff said, "Right." (*Id.*)[4]

---

[4] On summary judgment, plaintiff submitted the Declaration of Mitchell Goff, in which he stated that he "experience[s] far more difficulty doing common tasks" because of his foot drop. (Doc. 28-6, ¶ 11, PageID.317.) He further stated that he suffers "severe … pain related to a dead nerve," that this pain affects his sleep by "keeping [him] awake at night" with leg cramps, and that "[t]he pain is so severe that it becomes difficult to think." (*Id.*, ¶¶ 12-14, PageID.317-18.) These aspects of the Goff Declaration are challenged by defendant's Motion to Strike as violations of the "sham affidavit" rule. A subsequent affidavit submitted on summary judgment may be dismissed as a sham only if it contradicts, without explanation, previously given clear testimony. *See, e.g., Sconiers v. Lockhart*, 946 F.3d 1256, 1263-64 (11th Cir. 2020) (allegations may not be disregarded where they are not "blatantly contradicted"); *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010) ("Given that there is an inherent inconsistency between the affidavit and the two previous depositions, and Latimer has failed to provide an explanation for the contradiction, the affidavit may be dismissed as a sham."). In response to direct questioning in his deposition, Goff testified that his impairment "doesn't" affect his daily living, and that his back injury complications limit him "[n]ot a whole lot." This clear testimony directly contradicts the statements in his subsequent Declaration that he experiences far more difficulty doing common tasks, and suffers from severe pain that substantially limits daily activities of sleeping, thinking and walking. Plaintiff has come forward with no viable explanation to reconcile the glaring discrepancy, but unpersuasively tries to
(Continued)

### B. *Plaintiff's Application for the Pipefitter Job.*

In January 2018, Goff applied for a pipefitter position at Performance Contractors. (Doc. 28-2, at 28, PageID.264.) This application was for a job on a specific project, in which Performance was performing piping and steel work to retrofit a plant in Pensacola, Florida. (Doc. 26-2, PageID.163.) Leighton Mathis, Performance's site manager for that project, explained that pipefitters on the Pensacola job were required to lift over 25 pounds, work at heights above six feet, and operate machinery. (*Id.*, PageID.165.) These requirements were reinforced by a Performance job description for the pipefitter position, documenting essential functions such as climbing ladders and scaffolds, and lifting 50 pounds. (Doc. 26-4, PageID.182.)

After taking certain tests at Performance's offices in Grand Bay, Alabama, Goff was instructed to go to the Occupational Health Clinic (the "Clinic") in Pascagoula, Mississippi. (Doc. 28-2, at 71-74, PageID.268-69.)[5] Upon arriving at the Clinic, Goff met with John McMillin, M.D., for an examination. (Doc. 26-5, PageID.194.) During that meeting, Goff disclosed to Dr. McMillin that he had been prescribed and was taking Norco, a narcotic pain reliever. (*Id.*, PageID.195.) Based on that disclosure, Dr. McMillin included in his report a statement recommending "safety-sensitive restrictions because of chronic analgesics," meaning "[l]ong-term use of a pain medication." (*Id.*, PageID.196.) Goff's use of Norco for many years was Dr. McMillin's only reason for noting those restrictions on the form. (*Id.*, PageID.196-97.) Dr. McMillin's purpose in making that notation was "[t]o let the company know … that I have concerns about workplace environment." (*Id.*, PageID.198.) In his deposition, Dr. McMillin explained that his recommendation to companies like Performance is that "it's not worth that risk" to hire employees who take opioids for safety-sensitive jobs. (Doc. 28-1, at 56,

---

impugn defense counsel's deposition techniques in a manner not borne out by the record. Under well-settled law and after careful consideration of the parties' respective arguments and evidence in subsequent briefing (see docs. 33 & 35), the Motion to Strike (doc. 31) is properly **granted** as to these aspects of the Goff Declaration; therefore, those statements in the Declaration will be disregarded for summary judgment purposes under the "sham affidavit" rule.

[5] The Clinic has no affiliation with Performance, but rather performs a broad range of physical examinations for various clients for purposes such as pre-employment screening, fitness-for-duty exams, worker's compensation evaluations of injured employees, and so on. (Doc. 26-5, PageID.184-85.)

PageID.358.)  In support of this recommendation, Dr. McMillin relied on published guidance in an American College of Occupational and Environmental Medicine ("ACOEM") document entitled *ACOEM Practice Guidelines: Opioids and Safety-Sensitive Work*.  (*Id.*, at 57.)[6]

Dr. McMillin was not the final arbiter on whether Goff would or would not be allowed to work as a pipefitter for Performance.  His role was simply to make recommendations that would then be referred to medical professionals in another office to evaluate and determine whether to approve employees for hire.  (Doc. 26-5, PageID.197-98.)  To that end, a company called Prime Occupational Medicine ("Prime") in Baton Rouge, Louisiana, reviews all medical holds or restrictions for Performance employees.  (Doc. 26-6, PageID.201.)  In this case, Dr. McMillin forwarded Goff's paperwork to Prime, in accordance with routine practice.  (Doc. 28-3, at 9-10, PageID.274.)  Prime's role is to review the restrictions, examine the reasons why they were put in place, look at the prospective employee's job duties with Performance, and make a final recommendation to Performance as to those restrictions.  (*Id.* at 10-11, PageID.274.)  In so doing, Prime "look[s] for the pathology of their medical issue, the medications that they're taking and their job duties."  (*Id.* at 58-59, PageID.275.)

McMillin's records and recommendations concerning Goff were received and reviewed by Shawanna Sterling, a physician assistant at Prime.  (Doc. 26-6, PageID.202.)  Sterling examined both Dr. McMillin's paperwork and the job description for the pipefitter position for which Goff was being considered for hire by Performance.  (*Id.*)  In reviewing the paperwork, Sterling noted that Goff was prescribed to take a "safety-sensitive medication," specifically Norco, three times daily.  (*Id.*, PageID.203.)  Sterling was aware that "Norco is an opiate usually used for pain management."  (*Id.*, PageID.204.)  She consulted the packaging insert for Norco, and determined that its side effects include dizziness, light-headedness, impaired judgment and impaired cognitive function.  (*Id.*, PageID.204-05.)  Sterling was also aware from Dr. McMillin's records that Goff had a "chronic medical back issue," relating to the scar tissue in his back, and that he was taking Norco for that condition.  (Doc. 28-3, at 59, PageID.275.)  Goff confirmed

---

[6] In that Guideline, the ACOEM recommended as follows: "Acute or chronic opioid use is not recommended for patients who perform safety-sensitive jobs.  These jobs include … heavy equipment operation, … work with injury risks (eg. heights) and tasks involving high levels of cognitive function and judgment."  (*Id.*, PageID.364.)

both his medication intake and his back problems relating to scar tissue when he spoke to Sterling the next day. (Doc. 26-6, PageID.215.)

Based on the information presented to her, Sterling determined that certain restrictions were required for Goff to work the position at Performance, to-wit: "[N]o working at heights above six feet that required to be tied off, a lifting restriction of 20 pounds. … And no operating any type of machinery, forklifts, company vehicles and such." (Doc. 26-6, PageID.205.) Sterling based her recommendations "on Mr. Goff's pathology of his medical issue, the medication he is taking, his job duties, the length of time he has been taking the medication," as well as her own education and experience in the field of occupational medicine. (*Id.*, PageID.206.)[7] Sterling relayed that recommendation to Performance, and ultimately reduced it to writing. (*Id.*, PageID.210.)[8] At no time did Sterling or anyone else at Prime examine Goff in person, conduct a rigorous physical examination of his capabilities and limitations, or consult with Goff's personal physician or personal medical records about his physical abilities. (Doc. 28-2, at 24-25, 95-97, PageID.263, 270.)

Upon being notified by Prime of Goff's work restrictions, Performance's human resources manager, Steve Prentiss, contacted Leighton Mathis, the site supervisor for the Pensacola project for which Goff was being considered for hire. (Doc. 26-3, PageID.170, 178.) Mathis, who had approximately three decades of experience overseeing pipefitters in the field, determined that, based on the work restrictions imposed by Prime, Goff could not perform the

---

[7] In her deposition, Sterling testified that the lifting restrictions stemmed from Goff's back issue, while the climbing restriction was related to his opioid medication because it was potentially unsafe for him to climb and work at heights. (*Id.*, PageID.213-214.)

[8] In a report dated June 21, 2018, some five and a half months after she had made these recommendations and apparently after Goff had initiated EEOC administrative proceedings, Sterling summarized her recommendations, the information she had received from Goff concerning quantities and duration of medication, the job description from Performance and her determination that "the recommended restrictions are appropriate after considering the health/physical condition of Mr. Goff, the job duties, and current medication." (Doc. 28-3, PageID.280.) Sterling's written report concluded that Goff "has an unresolved physical condition that requires safety sensitive medication," that certain restrictions she recommended were because "[c]ertain physical duties may exacerbate his physical condition," and that "the safety sensitive medication pose an increased danger to the safety of Mr. Goff, as well as[] others in an industrial environment in regards to tasks that involve high levels of cognitive function and judgment." (*Id.*)

essential functions of the pipefitter job on the Pensacola project. (Doc. 26-2, PageID.165, 168.) In Mathis's judgment, essential functions of that job included lifting over 25 pounds, working at heights in excess of six feet, and operating machinery, with pipefitters performing those tasks daily or almost daily. (*Id.*)[9] Mathis had no open positions for the Pensacola project that could accommodate these restrictions. (*Id.*, PageID.165-66.) After learning that Mathis had no available jobs consistent with Goff's restrictions, Prentiss (the HR manager) contacted Performance's fabrication shop (which employs pipefitters and welders) to see if there were any available positions there that might accommodate Goff's work restrictions. (Doc. 26-3, PageID.178-79.)[10] He was notified that no such openings existed. (*Id.*, PageID.180.)

      C.      ***Defendant's Rescission of Plaintiff's Offer of Employment.***

On or about January 9, 2018, Performance contacted Goff by telephone and informed him that they could not use him (*i.e.*, his offer of employment was being rescinded) because of the Prime work restrictions. (Doc. 28-2, at 19 PageID.262.) At Goff's request, Performance gave him contact information for Prime to discuss the matter. Goff then called Sterling (the physician assistant at Prime who had made the recommendations to Performance), who told him that if his treating physician would change the Norco prescription to a non-narcotic that Prime would re-evaluate the restrictions so that he could work. (*Id.* at 20-21, 97-98, PageID.262, 270-71.) Goff professed willingness to make that change. He called the Pensacola job site to speak to the superintendent, at which time he thinks he spoke to someone named Brandon. (*Id.* at 22, PageID.263.) "Brandon" told him, "no matter what you do, … they've already made a ruling, they're not going to hire you." (*Id.* at 23, PageID.263.) There is no indication as to who "Brandon" might be or in what capacity (if any) he might have worked for Performance. Goff had no further contact with Performance and did not reach out to human resources or anyone else at Performance to discuss the matter further or explore potential ways of working around the

---

      [9]      In his deposition, Goff readily acknowledged that he expected the pipefitter position at Performance to require working at heights over six feet and lifting in excess of 20 pounds. (Doc. 26-1, PageID.145.)

      [10]      Prentiss testified that such actions were in conformity with his routine practice in attempting to find work at Performance for prospective employees with work restrictions, including contacting the specific job site to see if the restrictions could be accommodated and ascertaining whether any openings existed in the fabrication shop. (Doc. 26-3, PageID.172-73.)

Prime restrictions. (*Id.*) Nor did anyone from Performance contact Goff to evaluate possible accommodations or to explore vocational/medical testing to confirm or negate the validity of the work restrictions recommended by Prime. This litigation followed.

III. **Summary Judgment Standard.**

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed.R.Civ.P. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

IV. **Analysis.**

A. *Burden-Shifting Framework in ADA Discrimination Claims.*

For ADA claims based on circumstantial evidence, as Goff's are, courts apply the familiar *McDonnell Douglas* burden-shifting test. "Under the *McDonnell Douglas* framework, a plaintiff must first create an inference of discrimination through [his] *prima facie* case." *Trask v. Secretary, Dep't of Veterans Affairs*, 822 F.3d 1179, 1191 (11th Cir. 2016). "To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show: (1) he is disabled; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination because of his disability." *Holly v. Clairson Industries, L.L.C.*, 492 F.3d 1247, 1255-56 (11th Cir. 2007); *see also Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1179 (11th Cir. 2019) (similar). "Once

the plaintiff has made a *prima facie* case, a rebuttable presumption arises that the employer has acted illegally." *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010). "The employer can rebut that presumption by articulating one or more legitimate non-discriminatory reasons for its action." *Id.* "If it does so, the burden shifts back to the plaintiff to produce evidence that the employer's proffered reasons are a pretext for discrimination." *Id.* "[T]he ultimate burden of persuasion remains on the plaintiff to show that the defendant intentionally discriminated against [him]." *Id.*

On summary judgment, the parties spar over whether Goff can meet his threshold burden of establishing a *prima facie* case of disability discrimination, particularly as to the "disabled" and "qualified individual" prongs. As such, these questions are the appropriate analytical starting point. Should plaintiff be found to have successfully presented a *prima facie* case of disability discrimination, the parties also disagree as to the ensuing pretext analysis.

### B. *Whether Goff is Disabled.*

As an initial matter, Performance maintains that it is entitled to summary judgment on Goff's ADA claims because he cannot satisfy the "disability" prong of the *prima facie* test. "The ADA defines the term 'disability' as (1) a physical or mental impairment that 'substantially limits one or more' of an individual's 'major life activities,' (2) a 'record of such an impairment,' or (3) 'being regarded as having such an impairment.'" *Lewis*, 934 F.3d at 1179 (citations omitted). Goff argues that there is sufficient record evidence for a reasonable finder of fact to conclude that he is disabled under all three of these alternative statutory definitions.

To be "actually disabled," a plaintiff must have "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). Major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A). As pleaded in his Complaint, Goff alleges that he is "a person with a disability, partial paralysis and neuropathy in his left leg, that substantially limits one or more major life activities, including walking." (Doc. 1, ¶ 8, PageID.2.)[11] Goff has certainly established that he has the physical

---

[11] In his deposition, Goff was asked directly, "What is your disability?" to which he responded, "I have foot drop in my left leg." (Doc. 26-1, PageID.133.)

impairment of drop foot; however, "[a] physical impairment, standing alone, … is not necessarily a disability as contemplated by the ADA." *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 911 (11th Cir. 1996). Even viewed in the light most favorable to plaintiff, the record does not show that his impairment substantially limits the major life activity of walking, working, lifting or anything else. Goff's deposition negates any reasonable inference of such a substantial limitation to a major life activity; indeed, he testified that his drop foot / neuropathy impairment does not affect his daily life and that the complications from his back injury affect his daily living "[n]ot a whole lot." He also testified to having worked two decades in the construction business, on industrial job sites at heights, lifting up to 70 pounds, and wearing a tool belt weighing 20 pounds, even after developing this impairment. On this record, no reasonable factfinder could determine that Goff is actually disabled within the meaning of the ADA.[12]

Alternatively, Goff endeavors to establish the disability prong of his *prima facie* case by showing that Performance regarded him as disabled. Under the ADA, a "regarded-as" theory requires a plaintiff to "establish[] that he … has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the

---

[12] To be sure, Goff explained that he had to teach himself to walk again and that he has to think when he walks more than the average person does when there are obstacles in his path. But he also testified that, while walking with the impairment was initially challenging for him, "now it's not as much." A moderately below-average ability to walk is not an actual disability under the ADA. *See, e.g., Rossbach v. City of Miami*, 371 F.3d 1354, 1358 (11th Cir. 2004) ("other courts have consistently held that someone who walks, sits, stands or sleeps 'moderately below average' is not disabled under the Act"). Plaintiff has not explained away or overcome his own clear, unambiguous testimony that he is able to perform major life activities like walking and working without substantial limitations. Moreover, as noted *supra*, his attempts to inject new factual allegations into the record via summary judgment declaration alleging impairment of his ability to sleep and think because of severe pain are proscribed by the "sham affidavit" rule. Even if the Court were to accept the Goff Declaration on summary judgment as not being fundamentally inconsistent with his prior deposition testimony, the statements presented therein would not suffice to create a genuine issue of material fact on the point of actual disability. After all, while Goff stated in the Declaration that the nerve pain "is severe enough to affect my sleep" and that "it becomes difficult to think," he failed to provide any information about the frequency of these types of limitations to the major life activities of sleeping and thinking. On this record, given the vagueness of the Goff Declaration, even if it were properly considered at all, it would be impermissibly speculative to conclude that his nerve pain causes him to be substantially limited in sleeping and thinking because there are no record facts as to how often or how significantly his abilities to sleep and think are impaired.

impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). This theory endorses "the common sense principle that an employer that takes an adverse action because it fears the consequences of an employee's medical condition has regarded that employee as disabled." *Lewis*, 934 F.3d at 1182. Of course, "[a]n employer does not fire or otherwise discriminate against an employee 'because of' a perceived physical impairment unless the employer actually perceives that the employee has the impairment." *Equal Employment Opportunity Commission v. STME, LLC*, 938 F.3d 1305, 1316 (11th Cir. 2019).

The fundamental shortcoming in Goff's "regarded-as" argument is that the record lacks any evidence that Performance perceived him to be disabled. Plaintiff admits that no one from Performance ever said anything to him about drop foot. (Doc. 26-1, PageID.139-40.) The undisputed record evidence is that Performance withdrew Goff's job offer not because it believed him to be disabled, but because it received and reasonably relied on information from third-party medical evaluators imposing work restrictions on Goff that could not be reconciled with the essential functions of the pipefitter position for which he was being considered.[13] Those work restrictions, in turn, were primarily based on Goff's chronic, long-term history of taking safety-sensitive medication, which is, of course, not a disability. Plaintiff thus has failed to make any showing linking up Performance's decision not to hire him to any perceived disability. At best, the summary judgment evidence viewed in the light most favorable to Goff shows that work restrictions were imposed because of concerns arising from his long-term intake of a narcotic painkiller, not because anyone perceived him to have a physical impairment.[14]

---

[13] "Reasonable reliance on a medical opinion may demonstrate that an employer did not act on the myths, fears, and stereotypes associated with disability that the 'regarded as' definition of disability was designed to redress." *Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1190 (10th Cir. 2007) (citations omitted).

[14] To be sure, the record shows that Prime imposed – and Performance honored – a 20-pound lifting restriction for Goff. But plaintiff has not developed any record facts to suggest that Performance actually perceived Goff to be physically impaired. More importantly, the adverse employment action (*i.e.*, the rescission of the offer of employment) would have taken place regardless of the lifting restriction because of the disqualifying effect of Goff's usage of safety-sensitive medication. Simply put, Goff is ineligible to advance a "regarded-as" claim because he has not developed record facts to show that Performance withdrew his offer of employment "because of" a perceived disability. Nor has he presented (i) facts raising a reasonable inference that Prime imposed the lifting restriction based on a perception that he is physically impaired, much less (ii) legal authority or analysis establishing that any perception of (Continued)

On summary judgment, plaintiff also advances a "record of impairment" theory of ADA disability. This argument is outlined in cursory fashion, with plaintiff simply stating that Goff disclosed his "20-year record of his back impairment to" the third-party medical evaluators. (Doc. 29, PageID.340.) Plaintiff offers no evidence that the "record" he furnished to the third-party medical consultants reflected that his back impairment was substantially limiting in any major life activity. He presents no authorities to support the proposition that simply disclosing a back injury from 1998, even though he has continued to work without limitations in the construction field for the intervening two decades, is sufficient to support a "record of impairment" theory of liability under the ADA. *See generally* 29 C.F.R. § 1630.2(g)(3) ("record of" prong requires a showing of a record of "an impairment that substantially limits a major life activity").

For all of the foregoing reasons, the Court concludes that Goff has failed to meet his burden of showing that he is disabled within the meaning of the ADA. Because he has not made a *prima facie* case of disability discrimination, Performance is entitled to summary judgment on the ADA claims.

### C. *Whether Goff is a Qualified Individual.*

Even if Goff had established the "disability" prong of his *prima facie* case, Performance contends that summary judgment remains appropriate because he has failed to demonstrate that he is a "qualified individual," another required element of a *prima facie* case of disability discrimination.

A "qualified individual" for ADA purposes is someone with a disability who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "An ADA plaintiff must show either that he can perform the essential functions of his job without accommodation, or, failing that, … that he can perform the essential functions of his job with a reasonable accommodation." *Holly*, 492 F.3d at 1256 (citation omitted). "If the individual is unable to perform an essential function of his job, even with an accommodation, he is, by definition, not a 'qualified individual' and, therefore, not covered under the ADA." *Id.* (citation omitted).

---

a disability by Prime may somehow be imputed to Performance for purposes of establishing a "regarded-as" claim under the ADA.

Performance's argument on the "qualified individual" prong is straightforward. According to defendant, Goff cannot possibly be a qualified individual because (i) the pipefitter job for which he applied included as essential functions the ability to work at heights daily, to lift more than 50 pounds daily, and to operate machinery on a daily or almost-daily basis; and (ii) the work restrictions submitted to Performance by medical professionals at Prime prohibited Goff from working at heights above six feet, lifting more than 20 pounds, or operating machinery. Defendant also presents uncontroverted evidence that those work restrictions were primarily rooted in authoritative guidelines from the ACOEM reflecting that acute or chronic opioid use (which Goff unquestionably had) is not recommended for individuals who perform safety-sensitive jobs (which the subject pipefitter job unquestionably was). This undisputed record evidence establishes that Goff could not perform the essential functions of the pipefitter job without accommodation.[15]

The critical question for purposes of the "qualified individual" analysis thus becomes whether Goff could perform the essential functions of the pipefitter job with a reasonable accommodation. "The burden of identifying an accommodation that would allow a qualified employee to perform the essential functions of her job rests with that employee, as does the ultimate burden of persuasion with respect to showing that such accommodation is reasonable." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000). Although Goff makes much of the "interactive process" contemplated by the ADA and faults Performance for not initiating it, the law is clear that, where a plaintiff has failed to identify any reasonable accommodation, "there is

---

[15] In contesting defendant's assertions, Goff relies on record evidence that he was actually capable of lifting up to 70 pounds and that he passed Performance's climbing test by climbing 10 feet. But this argument misses the point. The determination of whether Goff was a "qualified individual" cannot simply ignore, erase or disregard the work restrictions devised by medical professionals and submitted to Goff's employer. Merely quarreling with the accuracy of those restrictions does not vault Goff to "qualified individual" status. And plaintiff has no rejoinder that might raise genuine issues of material fact rebutting defendant's evidence that the work restrictions in question were backed by ACOEM guidelines recommending against safety-sensitive work for individuals with his protracted track record of prescription opioid use. At any rate, plaintiff identifies neither authority nor persuasive legal argument supporting the proposition that work restrictions imposed by third-party medical providers may be excluded from the "qualified individual" analysis where the plaintiff disagrees with them, or that challenging the wisdom of such restrictions on factual grounds somehow gives rise to genuine issues of material fact as to whether he was a qualified individual for ADA purposes.

no basis for imposing liability on Defendant for failing to engage in an 'interactive process' to identify accommodations." *Frazier-White v. Gee*, 818 F.3d 1249, 1257-58 (11th Cir. 2016). In short, if Goff cannot point to a reasonable accommodation that would have allowed him to perform the essential functions of the pipefitter job, then he is not a "qualified individual" and cannot proceed on his ADA claims.

On summary judgment, plaintiff contends there are two reasonable accommodations that would have allowed him to perform the essential functions of the pipefitter position at the Pensacola job site. First, Goff contends Performance could have reasonably accommodated his disability by "allow[ing] him to change his medicine to a non-narcotic." (Doc. 29, PageID.348.) As an initial matter, plaintiff's framing of the proposed accommodation in these terms defies logic. It was not up to Performance to "allow" or "disallow" Goff to modify his prescription pain medication; rather, that determination was for Goff and his treating physicians to make. More fundamentally, plaintiff has made no showing that his doctors would have switched his prescription to a non-narcotic upon request, that such a medication would have been effective at managing Goff's pain in a manner consistent with enabling him to work on a construction job site, that the alternative medication (which has never been identified) would have met with the approval of the third-party medical professionals retained by Performance to perform entrance examinations for new hires, or that simply modifying Goff's prescription after 20 years of taking Norco would alleviate concerns memorialized in the ACOEM guidelines about chronic opioid use for individuals in safety-sensitive positions. Thus, if "allowing" Goff to change his prescription pain medication is even a reasonable accommodation at all (which is far from clear as a legal matter), plaintiff has made no showing that it was available or feasible here, but simply relies on speculation and vague statements. On this threadbare record, no reasonable finder of fact could conclude that Goff was a "qualified individual" by virtue of the proposed accommodation of changing his pain medication to a non-narcotic.

Second, Goff identifies as a reasonable accommodation that Performance should have "allow[ed] him to prove that he could do the job." (Doc. 29, PageID.349.) In other words, plaintiff proposes that Performance should have disregarded the work restrictions recommended by its third-party occupational health vendors, or at least staged an in-depth independent investigation pitting Prime's medical judgment against Goff's evidence of ability to work, with Performance somehow serving as the final decisionmaker, weighing the competing evidence and

arguments, and deciding whether to discard Prime's guidance or not. Even assuming such a course of action were possible as a practical matter, and that Performance were equipped to parse the medical evidence in this manner, plaintiff cites no authorities lending support to the proposition that jettisoning work restrictions recommended by third-party occupational health professionals is a reasonable accommodation, or that the ADA would require an employer to do so under the aegis of reasonable accommodation. *See generally E.E.O.C. v. BNSF Ry. Co.*, 124 F. Supp.3d 1136, 1158 (D. Kan. 2015) ("nothing in the ADA or its implementing regulations requires an employer, at the applicant's request, to permit the applicant to demonstrate how he or she will be able to perform job-related functions").[16]

In sum, plaintiff has failed to identify any reasonable accommodations that would have enabled Goff to perform the essential functions of the pipefitter position consistent with Prime's work restrictions. Accordingly, he cannot meet the legal standard for a "qualified individual" under the ADA, and cannot establish a *prima facie* claim for relief under the Americans with Disabilities Act under any theory.

Not only does the absence of a reasonable accommodation preclude "qualified individual" status for Goff, but it also is fatal to Goff's ADA failure-to-accommodate cause of action. Even if Goff had shown that he was disabled and was a qualified individual, he has not identified any reasonable accommodations that would have enabled him to perform the essential functions of the pipefitter position at Performance. Defendant could not have violated a legal duty to provide reasonable accommodations to Goff if no such accommodations exist. Besides, the record in the light most favorable to plaintiff does not show that Goff ever requested a reasonable accommodation from any manager or supervisory official at Performance, and "[a]n employer's duty to provide a reasonable accommodation … is not triggered unless a specific demand for an accommodation has been made." *Adigun v. Express Scripts, Inc.*, 742 Fed.Appx.

---

[16] To be sure, it is possible to envision scenarios in which the ADA might compel an employer to reconsider or reject work restrictions recommended by its medical contractors in an entrance examination for a prospective employee. For example, if there were evidence that the medical personnel's recommendations were themselves the product of unlawful disability discrimination, then the ADA may require the employer to discard those recommendations. But no such evidence appears in the record here; to the contrary, Prime's restrictions were grounded in objective, verified facts concerning Goff's long-term use of safety-sensitive medication, as well as unambiguous ACOEM guidance.

474, 476 (11th Cir. Aug. 7, 2018) (citation and internal quotation marks omitted).[17] At any rate, uncontroverted record evidence reflects that, upon being informed of Goff's work restrictions as recommended by Prime, Performance officials endeavored to find an accommodation for Goff by (i) inquiring of the superintendent on the Pensacola job site whether any pipefitter work existed that might comport with Goff's work restrictions, and (ii) determining whether any openings existed at Performance's fabrication shop, where the work could be done without climbing, heavy lifting or machine operation. Both of Performance's inquiries were answered in the negative, but the record nonetheless reflects that defendant attempted in good faith to find an accommodation that would enable Goff to work for Performance in a manner that satisfied his work restrictions.[18] For all of these reasons, plaintiff's ADA failure-to-accommodate claim fails as a matter of law.

### D. *Nondiscriminatory Reason and Pretext Analysis.*

As shown by the foregoing analysis, Goff has failed to make a *prima facie* showing of disability discrimination and therefore cannot proceed with his ADA claims against Performance. Accordingly, there are no genuine issues of material fact and Performance is entitled to entry of judgment as a matter of law on all claims asserted in Goff's Complaint. Even assuming that Goff had made the necessary *prima facie* showing, however, the remaining steps of the *McDonnell Douglas* burden-shifting analysis reconfirm that no genuine issues of material fact remain and that defendant's Motion for Summary Judgment is properly granted.

---

[17] In particular, it is undisputed that Goff <u>never</u> requested accommodation from Prentiss (Performance's human resources manager) or Mathis (Performance's superintendent on the Pensacola job site). To be sure, Goff says he spoke with a person at Performance who might have been named Brandon, and that "Brandon" told him that Performance would not hire him even if he switched to a non-opioid pain medication. But there is no indication as to who "Brandon" is, what role (if any) he has at Performance, and how Performance might be legally responsible for any of "Brandon"'s acts or omissions with respect to accommodation requests. Simply put, plaintiff identifies neither facts nor law under which any failure to accommodate by "Brandon" might be imputable to Performance.

[18] Performance's human resources manager, Prentiss, summarized those efforts as follows in his deposition: "Yeah, I mean that we're going to try to help everybody go to work. If they come to our office looking for a job, we're going to try to put them to work at all costs. … If we can help them go to work, we're going to put them to work." (Doc. 26-3, PageID.174-75.)

When a plaintiff establishes a *prima facie* case of disability discrimination, the burden shifts to the defendant to come forward with legitimate nondiscriminatory reasons for the challenged personnel action. Performance has plainly met this light burden. Its evidence is that Performance withdrew Goff's conditional employment offer because the work restrictions imposed by Prime rendered it impossible for Goff to perform the essential functions of the pipefitter position.[19]

Defendant having met its burden of articulating a legitimate, nondiscriminatory reason for rescinding the offer of employment, plaintiff must make a showing of pretext in order to withstand summary judgment on the ADA causes of action. *See Johnson v. Miami-Dade County*, 948 F.3d 1318, 1325 (11th Cir. 2020) ("if the defendant offers a legitimate, nondiscriminatory reason for its employment decision, the burden shifts back to the plaintiff to establish that the reason offered by the defendant was not the real basis for the decision, but a pretext for discrimination") (citation and internal quotation marks omitted). Of course, "[a] reason is not pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 (11th Cir. 2018) (citations omitted).

On summary judgment, plaintiff points to no evidence that Performance's decision was driven by discriminatory animus towards Goff based on his drop foot and back issues. Nor could plaintiff persuasively make such an argument, given the uncontroverted evidence that Performance's decision was based exclusively on Goff's work restrictions that precluded him

---

[19] To be clear, plaintiff has not argued, and cannot reasonably argue, that Performance's practice of requiring Goff and other prospective new hires to submit to pre-employment screenings was unlawful or probative of discrimination. The ADA expressly authorizes employers to engage in such screenings. *See, e.g.,* 42 U.S.C. § 12112(d)(3) ("A covered entity may require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant, and may condition an offer of employment on the results of such examination …"); *Flores v. American Airlines, Inc.*, 184 F. Supp.2d 1287, 1294 (S.D. Fla. 2002) ("The ADA permits an employer to … conduct a medical examination after the employer has tendered a conditional offer of employment to an individual, so long as the employer does so for all individuals in that job category.").

from performing essential functions of the job.[20] Instead, plaintiff focuses on the validity of Prime's determination that those work restrictions were appropriate because of Goff's long history of taking opioid pain medication. It is true, of course, that prohibited discrimination under the ADA includes "participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter." 42 U.S.C. § 12112(b)(2). But there is no evidence supporting a reasonable inference that the third-party medical professionals retained by Performance were motivated by discriminatory animus, myths, fears or stereotypes in placing those work restrictions on Goff. To the contrary, the record plainly establishes that the medical contractors (i) reviewed Goff's medical status and medication intake, including types, doses, frequencies, and duration; (ii) confirmed the medication-related information from Goff by telephone; (iii) examined the job description supplied by Performance for the position in question; and (iv) consulted and relied on industry standard sources, including particularly the American College of Occupational and Environmental Medicine's guidelines and recommendations concerning opioids and safety-sensitive work. This is precisely the sort of "individualized determination" on which employers are permitted to rely in withdrawing an offer of employment. *See, e.g., E.E.O.C. v. American Tool & Mold, Inc.*, 21 F. Supp.3d 1268, 1283 (M.D. Fla. 2014) ("the results of the pre-employment screening may only be used to withdraw an

---

[20] Plaintiff contests the point by contending that Performance has offered inconsistent reasons for this personnel decision at different times. Specifically, plaintiff posits that Performance represented to the Equal Employment Opportunity Commission in its position statement that it had withdrawn Goff's offer of employment for reasons other than medical restrictions, to-wit: his failure to pass computer-based tests at Performance. Plaintiff further argues that those reasons were false because Goff actually passed those tests. Certainly, evidence of "weaknesses, implausibilities, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action" can give rise to a finding of pretext. *Hornsby-Culpepper*, 906 F.3d at 1312 (citations omitted). Nonetheless, plaintiff's argument breaks down because the position statement identifies only one reason for Performance's decision not to hire Goff, as follows: "Performance did not hire Goff … because the medical restrictions placed on him rendered him unable to perform the essential functions of his position and [P]erformance was not able to otherwise reasonably accommodate Mr. Goff." (Doc. 28-5, PageID.386-87.) Performance articulates precisely the same legitimate nondiscriminatory reason for the adverse employment action now. There being no <u>material</u> inconsistencies between what Performance told the EEOC and what Performance is telling this Court were its grounds for not hiring Goff, plaintiff cannot establish the requisite showing of pretext in this manner.

offer of employment where an individualized determination reveals that the impairment will preclude the putative employee from performing the essential functions of the position").

The bulk of Goff's summary judgment response is devoted to criticizing the medical contractors' methodology, pointing out additional measures they could have taken, and disagreeing with their conclusions. That is not the correct inquiry for ADA purposes. The law of disability discrimination is not concerned with judging whether a medical professional's recommended work restrictions in a plaintiff's pre-employment screening are right or wrong from a strictly medical standpoint. *See, e.g., Sumler v. University of Colorado Hospital Authority,* 2018 WL 5043907, *11 (D. Colo. Oct. 17, 2018) ("The Court is not deciding whether Dr. Roth's restrictions were medically right or wrong."). The issue is first, whether Performance honestly believed those work restrictions were valid and acted in good faith on that belief, and second, whether there is any evidence of discrimination by the medical professionals in formulating those restrictions. On this record, the former question is unambiguously answered in the affirmative and the latter question is unambiguously answered in the negative. So, while plaintiff is correct that the ADA makes it unlawful for an employer to participate in an arrangement whose effect is "subjecting a covered entity's qualified applicant … with a disability to the discrimination prohibited by this subchapter," 42 U.S.C. § 12112(b)(2), plaintiff still must show that there are genuine issues of material fact as to whether prohibited disability discrimination occurred. Goff has not done so. At best, he has shown that Prime could have taken additional steps and made additional inquiries before making its final recommendations as to Goff's work restrictions. But a medical provider's failure to undertake the most exhaustive pre-employment screening measures available is not automatically equated to disability discrimination. Perhaps reasonable medical contractors could disagree about the propriety of the work restrictions imposed by Prime. But that possibility does not raise a reasonable inference of disability discrimination or any unlawful conduct under the ADA. Plaintiff comes forward with neither argument nor authority to support a conclusion that ADA liability may be imposed on an employer simply because the medical provider performing a pre-employment screening exam "got it wrong," without more.[21]

---

[21] For purposes of this analysis, the Court is focusing on the restrictions on climbing and operating machinery, both of which were rooted solely in Goff's long-term chronic use of (Continued)

Ultimately, plaintiff's theory of pretext on all of his ADA causes of action is founded on nothing more than a bare belief that the medical contractors reached a faulty decision, that he should have been allowed to contest that decision by presenting medical and vocational evidence to the contrary, and that the resulting withdrawal of his employment offer by defendant was unfair. None of that reasoning yields disputed factual questions as to whether Performance intentionally discriminated against him based on his disability or breached a duty to provide reasonable accommodation. As such, plaintiff's ADA claims fail as a matter of law.

## V. Conclusion.

For all of the foregoing reasons, it is **ordered** as follows:

1. Defendant's Motion to Strike (doc. 31) is **granted** as to the statements in Goff's Declaration concerning severe pain, purported difficulty doing common tasks, and limitations on his ability to sleep, think and walk. Those statements are **stricken** pursuant to the sham affidavit rule;

2. Plaintiff's Motion to Supplement (doc. 32) is **granted**;

3. Defendant's Motion for Summary Judgment (doc. 25) is **granted** because there are no genuine issues of material fact, and defendant is entitled to entry of judgment as a matter of law; and

4. This action is **dismissed with prejudice**; and

5. A separate Judgment will enter.

DONE and ORDERED this 8th day of April, 2020.

           s/ WILLIAM H. STEELE
           UNITED STATES DISTRICT JUDGE

---

safety-sensitive medication. Those restrictions were based not on stereotypes about disability, but on an individualized assessment of Goff's many years of taking prescription opioids, the specifications of the job, and specialized guidelines courtesy of the ACOEM. In so clarifying its reasoning, the Court recognizes that Goff's lifting restrictions may be problematic from an ADA standpoint because they were based on untested assumptions about his back condition (as to which Performance's medical providers possessed little information) rather than any kind of individualized assessment about Goff's abilities and limitations. Even if the lifting restriction were stricken as improper under the ADA, however, Goff still would have been unable to perform the pipefitter job because of the medication-related restrictions, and would be unable to identify any facts supporting a reasonable inference of pretext or disability discrimination by Prime in imposing those restrictions or by Performance in relying on them.